# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 12, 2011

Lyle W. Cayce
Clerk

No.  10-20794

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

BARRY LERNARD DAVIS, aka Sir Lewis,

Defendant-Appellant

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:09-CR-390-1

Before HIGGINBOTHAM, DAVIS, and STEWART, Circuit Judges.

PER CURIAM:[1]

Barry Lernard Davis, aka Sir Lewis, was found guilty by a jury of sex trafficking of children in violation of 18 U.S.C. § 1591(a) (count one); transportation of minors with intent to engage in criminal sexual activity in violation of 18 U.S.C. § 2423(a) (count two); and coercion and enticement of an individual to travel in interstate commerce to engage in prostitution or any sexual activity for which an individual would be charged with a criminal offense, in violation of 18 U.S.C. § 2422 (count three).  The district court sentenced Davis

---

[1] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-20794

to the maximum guideline sentence: concurrent 405-month terms of imprisonment on counts one and two, and a concurrent 240-month term of imprisonment on count three. Davis was also sentenced to supervised release for a life term. He filed this appeal, challenging the propriety of the judgment of conviction and the sentence imposed.

I

On September 15, 2006, Pasadena Independent School District officer Matthew Gray was alerted to the disappearance of CM, a 16-year old pregnant female from Houston, Texas. During his investigation, Officer Gray discovered that someone was accessing CM's myspace account using an America Online subscription owned by "sensual 107." Another myspace webpage associated with "sensual107" displayed nude photographs of CM. The American Online account was traced back to Joe Davis, who told the police that it had been opened with his credit card by his 32-year-old son, Barry Davis. Continued monitoring revealed that CM's myspace account was being accessed from a hotel in New Orleans, Louisiana, where she was checked in under the alias "Cassandra Gonzales." Several days later it was accessed from a hotel at which Barry Davis was staying in Canton, Mississippi.

Officer Gray contacted Special Agent Patrick Fransen of the Federal Bureau of Investigation ("FBI") for assistance. Agent Fransen asked Joe Davis to tell his son Barry to contact him. At trial, Agent Fransen testified that Barry Davis called him that same evening, denied knowledge of CM's whereabouts, and promised that he would check with some of his "pimp partners" to see if he could find her. Two days later, a very upset CM met her mother and Officer Gray at a Greyhound Bus Station in Houston, Texas. She told Officer Gray that she had been with Davis, and gave him a cell phone number matching the one used by Davis in prostitution advertisements and when checking in to the hotel in Canton, Mississippi. CM refused to cooperate any further.

No.  10-20794

Around this same time, Agent Fransen received a telephone call from Nichole Clock about an unrelated case.  When she arrived at his office, Agent Fransen noticed that Clock was in a car driven by Barry Davis, and that another girl who appeared to be a juvenile was in the backseat of the vehicle.  He instructed Clock to call Davis to come pick her up.  When Davis saw Agent Fransen, he unsuccessfully attempted to flee.

When asked who she was, the girl in the backseat of the car initially gave Fransen a false identification card with the name "Cassandra Gonzales," the same alias used by CM.  She eventually admitted that her real name was Amber Case and that she was 18 years old.  Davis consented to a search of his car, in which officers discovered marijuana and a "pimp chalice" emblazoned with both "Sir Louis" and "713," Davis's cell phone area code.  They also found a laptop computer belonging to Davis named "Sir Lewis" that contained photographs of CM, Clock, and Case, and a spiral notebook with a note stating: "I, [CM], did nothing illegal."  When asked if he was prostituting these girls, Davis replied that "girls are going to do prostitution, everybody knows," and that all of his girls only gave "body rubs" to their clients.

At trial, Officer Gray and Agent Fransen testified about all of the facts uncovered during their investigation.  CM and Clock also testified on behalf of the government about their experiences with Davis.

CM told the jury that she was a repeat runaway.  At the age of 15, while living on the street, she moved in with Barry Davis in Houston, Texas.  She testified that she told Davis she was a minor before their relationship became sexual.  Three months later, Davis ordered her to have sex with three men for money, as it was time for her to give back to Davis for having provided for her.

CM explained that she continued to prostitute for Davis in order to survive and to keep the material goods that he gave her, such as designer clothes.  Several months later she became pregnant and returned home.  A short while

No. 10-20794

later, however, and still pregnant, she returned to Davis. She testified that Davis advertised her services online using nude pictures, several of which were shown at trial, and took her to Memphis, Tennessee and New Orleans, Louisiana, to prostitute for him. Donna Davis, a hotel employee in Metarie, Louisiana, testified about one of their stays at her hotel, including a scene they created when Davis had provocative pictures of CM taken in the hotel's fountain.

Davis brought CM back to Houston, CM testified, after receiving a call from Agent Fransen. Davis told CM that "they"were looking for her and ordered her to write a note in his spiral notebook stating that she had never engaged in sexual activity with him. CM obeyed because she was afraid of Davis, who was abusive. Davis left CM at a Greyhound bus stop where she met her mother and Officer Gray. Once again, however, CM found life at home difficult and returned to Davis. This time Davis had her tattoed with "SL," which stood for his pimp moniker "Sir Lewis." A month later CM ran away from Davis for the last time.

Nichole Clock also testified at trial about her time prostituting for Davis. Clock told the jury about the "rules" used by pimps to maintain control over the women who prostitute for them, and stated that Davis had her tattooed with his pimp moniker, "Sir Lewis," on the back of her neck. She explained that she prostituted for Davis because they were romantically involved and because she was afraid of him. She also claimed that he took her to multiple cities to prostitute, including Chicago, St. Louis, New York, New Jersey and New Orleans. Pictures of Clock and Davis in several of those cities were found on Davis's computer and presented at trial. Clock eventually ran away from Davis, but returned to him in September 2006. She left him permanently after Davis attacked her while she was in the hospital.

The jury found Davis guilty on all three counts against him. The district court sentenced him to three concurrent terms of imprisonment: 405 months on counts one and two, and 240 months on count three.

No. 10-20794

II

Davis first argues that his equal protection rights were violated when testimony by government witnesses regarding the culture of prostitution turned racial, allowing the jury to consider race as a factor in determining his guilt.

Because Davis did not object to this testimony at trial, our review is for plain error. To prevail under this standard, Davis must demonstrate that "(1) there was an error; (2) the error is plain; and (3) the error affected [his] substantial rights, was prejudicial and affected the outcome of the district court proceeding."[2] Furthermore, we exercise our discretion to correct such an error only if it "seriously affects the fairness, integrity or public reputation of judicial proceedings."[3] This requires Davis to show a reasonable probability that the alleged error affected the outcome of the trial.[4] Davis carries the burden of persuasion.[5]

It is undisputed that prosecutorial use of a criminal defendant's race as evidence of guilt violates that defendant's due process and equal protection rights.[6] Davis alleges that the government engaged in such conduct during his

---

[2] *United States v. Bishop*, 629 F.3d 462, 468 (5th Cir. 2010) (internal quotation marks omitted); *see also* FED. R. CRIM. P. 52(b) ("Plain error. A plain error that affects substantial rights may be considered even though it was not brought to the court's attention.").

[3] *Bishop*, 629 F.3d at 468 (quoting *United States v. Olano*, 507 U.S. 725, 736 (1993)).

[4] *United States v. Olano*, 507 U.S. 725, 734 (1993); *see also United States v. Marcus*, 130 S. Ct. 2159, 2166 (2010) ("In cases applying this fourth criterion, we have suggested that, in most circumstances, an error that does not affect the jury's verdict does not significantly impugn the fairness, integrity, or public reputation of the judicial process.") (internal citations omitted); *Puckett v. United States*, 129 S. Ct. 1423, 1429 (2009) ("Meeting all four prongs is difficult, as it should be.") (internal quotation marks omitted).

[5] *Olano*, 507 U.S. at 734–35.

[6] *See, e.g.*, *McCleskey v. Kemp*, 481 U.S. 279, 310 n. 30 (1987) ("The Constitution prohibits racially biased prosecutorial arguments."); *Bains v. Cambra*, 204 F.3d 964, 974 (9th Cir. 2000) (use of race or ethnicity to establish guilt "violates a criminal defendant's due process and equal protection rights"); *United States v. Doe*, 903 F.2d 16, 25 (D.C. Cir. 1990) ("Racial fairness of the trial is an indispensable ingredient of due process and racial equality

5

No. 10-20794

trial four times by eliciting racial testimony and repeating it during the prosecution's closing argument. That testimony, Davis argues, impermissibly suggested to the jury that Davis – a black man – was more likely by virtue of his race to be a pimp, and therefore guilty of the crime charged against him.

The first time that the jury heard the challenged testimony was during the direct examination of Nichole Clock, a former prostitute who testified for the government regarding her experience with Davis as her pimp and about the rules used by Davis and other pimps to coerce prostitutes into remaining under their control. Clock explained that she gave all the money she earned to Davis because she was required to do so by "the rules of the game."

> Prosecutor: And do [pimps] all pretty much go by this code of rules?
> Clock: Yes.
> Prosecutor: Can you give me an example? What are some of the rules that these pimps would have?
> Clock: You can't look at other black men. All the money goes to them.
> Prosecutor: Let's slow down. Why can't you look at other black men? I would assume there is a reason for the rules; is that correct?
> Clock: Yes.
> Prosecutor: Why can't you look at other black men?
> Clock: Because they are afraid that they will lose you for the next black man.
> Prosecutor: How is that possible?
> Clock: They could be cuter. They could be nicer. They could be more suave, I guess.
> Prosecutor: What if you looked at them, what would happen?
> Clock: Sometimes you would get in trouble, like, getting your a** beat.
> Prosecutor: Who would beat you?
> Clock: Either your pimp or the one you looked at.

---

a hallmark of justice.").

6

No. 10-20794

Later during Clock's testimony, the prosecutor repeated this testimony when asking Clock how she had come to work for Davis.

> Prosecutor: How did you meet the defendant?
> Clock: I believe he drove by and we made eye contact, and then he got out of the car and came over and talked to me.
> Prosecutor: Okay. But wasn't that dangerous for you to make eye contact with him? He is a black male.
> Clock: He is, but I knew that [my pimp] was in [another city], so there wasn't really anything he could do to me.

Another government witness, FBI Special Agent Vanessa Walther, was also called by the prosecution to testify about how the "rules of the game" are used by pimps to control prostitutes. She gave a similar account.

> Prosecutor: When you say there are rules about how [prostitutes] relate to other pimps, what are you talking about?
> Agent Walther: Basically a girl is told that she should not date another black male, because he might be a pimp. She is not allowed to make eye contact with another pimp. Because if she does, she is considered to be what they call "out of pocket." And that will allow the pimp that she has made eye contact with to actually take her and take the money that she has on her, if she has any at that time. And she becomes his property at that point.

Finally, the prosecution referred back to this testimony during its closing argument. After reviewing evidence that Davis had coerced girls and women into working as prostitutes for him, the prosecutor stated:

> Everything they did was completely controlled by Barry Davis. And the rules of the game: You don't look at another black man. You don't get out of pocket. You work for me. You are my property. And it was brilliant, because unlike a commodity that one sells, he sold these girls over and over and over again.

Both parties agree that the testimony in this case closely resembles testimony that this court held was erroneously admitted in *United States v.*

7

No.  10-20794

*Anderson*.[7]  In that case, an FBI special agent testifying about the culture of prostitution stated that prostitutes avoid making eye contact with black males because of the risk that "he might be another pimp."[8]  We concluded then, as we do now, that it was error for the court to allow such testimony.  "Testimony from a prosecution witness stating or implying that persons of the same race as the defendant are more likely to commit certain crimes is impermissible, both on constitutional grounds and because its probative value is outweighed by its danger of unfair prejudice."[9]  As in *Anderson*, the government argues today that this testimony was permissible because it was for the innocuous purpose of showing how pimps coerce prostitutes into working for them.  While this may have been the intention, error nonetheless occurred when the testimony turned racial such that it may have implied to a reasonable juror that the defendant was more likely to have been a pimp by virtue of being a black male.

To obtain relief, however, Davis must also persuade us that there is a reasonable probability that the outcome of his trial would have been different without this testimony.  In *Anderson*, we concluded that the error was harmless beyond a reasonable doubt because it was not probable, given the overwhelming evidence against the defendant, that the verdict would have been different had

---

[7] 560 F.3d 275 (5th Cir. 2009).

[8] *Id.* at 280.
"Agent: One of the rules is that a girl is told not to look or make eye contact with any young Black male because he might be another pimp.
The Court: Well what about potential customers?  How does that jibe with the–that rule?
Agent: Most of the girls will not have a date with a young Black male.  They will avoid that.  A lot of them avoid all Black males in general.
The Court: Why is that?  Is there a reason for that?
Agent: The reason is mainly they're afraid that that's going to be a pimp–."
*Id.*

[9] *Id.* at 281.

No.  10-20794

the challenged testimony been excluded.[10]  Davis correctly points out that the challenged testimony was repeated four times over the course of the trial, whereas in *Anderson* it was heard by the jury only once and not repeated by the prosecutor during his closing statement.  While we agree that this distinguishes this case from *Anderson*, Davis has not demonstrated that these repetitions were sufficient to make it reasonably probable that the jury's verdict was influenced by them.

The evidence presented against Davis during the three-day trial was overwhelming.  Two women testified to their personal experiences working as Davis's prostitutes, one while she was only fifteen years of age, and the details of their stories corroborated one another. Evidence from Davis's computer, from his car, and from a New Orleans employee also linked Davis to the interstate prostitution business and to the women testifying against him.  Finally, a local police officer and two FBI agents testified as to their investigations into the crimes alleged against Davis.  Given the wealth of evidence amassed against him, we cannot conclude that there is a reasonable probability that the jury would have come to a different conclusion regarding Davis's guilt if the four statements about looking at black men had been excluded by the district court.

The cases relied on by Davis are not inapposite.  Davis points to three cases where circuit courts found reversible error based on testimony linking the defendant's alleged criminal actions to his ethnic background.  In each of these cases, however, the challenged testimony was significantly more pervasive and inflammatory than it was here.  In *United States v. Vue*, a customs officer testified against defendants of Hmong descent, and repeatedly stated that persons of Hmong descent controlled approximately 95% of the opium trade in

---

[10] *Id.*

that region.[11]  Unlike in this case, the references made were not cursory, but instead constituted a considerable portion of the testimony of the government's key witness.[12]  Given the pervasive nature of these statements "inject[ing] ethnicity into the trial" and "clearly invit[ing[ the jury to put the Vues' racial and cultural background into the balance in determining their guilt," the court concluded that the admission of the evidence was not harmless beyond a reasonable doubt and thus that the Vues' convictions were subject to reversal.[13]

In *United States v. Doe*, a circuit court again concluded that the admission of testimony by an expert witness was not harmless error.[14]  In that case, an expert witness repeatedly emphasized control over the drug trade by Jamaicans.[15]  In its closing statement, the prosecution repeatedly referred to this testimony, referred to the defendants as "Jamaicans," and made inflammatory statements that "Jamaicans...[are] coming in [and] taking over the retail sale of crack in Washington D.C.," and Jamaicans are "coming into the apartments, they're taking them over, they're using them for drugs, they're using them to package the drugs, to cook them, and to sell them on the street."[16]  The court concluded that these racial arguments coupled with the "hardly overwhelming" evidence of guilt presented against the defendants meant that the admission of the testimony was not harmless error.[17]

---

[11] 13 F.3d 1206 (8th Cir. 1994).

[12] *Id.* at 1211–13.

[13] *Id.* at 1213.

[14] 903 F.2d 16 (D.C. Cir. 1990).

[15] *Id.* at 19–20.

[16] *Id.* at 26–27.

[17] *Id.* at 28 ("Several circumstances tended positively to show that appellants were not the operators of the drug-distribution enterprise based therein; indeed, the jury in the first trial was unable to agree that any appellant was guilty of any of the offenses charged.").

No.  10-20794

Finally, in *United States v. Rodriguez Cortes*, the district court admitted into evidence an identification card showing that the defendant was of Colombian descent.[18]  This card had virtually no probative value; it was used by the government instead to argue that it showed the defendant was Colombian and therefore that known Colombian drug dealers would have trusted him.  The prosecutor stated in closing, "[y]ou also have a Colombian I.D....This man, this young man has ties with Colombia, from there you can reasonably infer why Libardo Sierra was calling him his friend."[19]  The court concluded that in context, the sole purpose of the admitted evidence was an appeal to the jury to believe that a person born in Colombia must be involved in drug trafficking.

The challenged testimony and prosecutorial statement in Davis's case, while improper, were not of such frequency, length, or of such an inflammatory nature as to call into doubt the overall fairness of his trial.  The improper statements constituted only a few cursory references in the course of a three-days trial during which the government presented a great deal of direct and circumstantial evidence on all three counts against the defendant.  Thus, because he has not shown that the error affected his substantial rights and seriously affected the integrity of the proceeding below, Davis is not entitled to relief on his first ground of appeal.

### III

The second challenge raised by Davis against his conviction is that the evidence presented against him at trial was insufficient to establish his guilt beyond a reasonable doubt.  Davis was convicted of all three counts alleged against him.  He challenges the sufficiency of the evidence for each of these by

---

[18] 949 F.2d 532 (1st Cir. 1991).

[19] *Id.* at 541.

11

arguing that two government witnesses, CM and Nichole Clock, were not credible.

Our review of a  jury verdict is "highly deferential."[20] "This court must affirm a conviction if the evidence, viewed in the light most favorable to the verdict, with all reasonable inferences and credibility choices made in support of it, is such that a trier of fact reasonably could have found the essential elements of the crime beyond a reasonable doubt."[21]  By following this standard, we recognize that it is "the responsibility of the trier of fact to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."[22]  Thus, so long as any rational trier of fact could have found that the essential elements of the defendant's crime were proven beyond a reasonable doubt, we affirm the verdict.[23]

To find Davis guilty of count one (sex trafficking of children), the jury had to find beyond a reasonable doubt that Davis knew CM was a minor and that Davis intended to transport CM out of state to engage in prostitution.  To find him guilty of count two (transportation of minors with intent to engage in criminal sexual activity), the jury had to find beyond a reasonable doubt that Davis actually did transport CM across state lines with the intent of engaging in criminal sexual activity.  Davis contends that the only proof of these elements was provided by CM's testimony, and that her testimony was not credible both because it had inconsistencies, and because CM is a prostitute and "part of the game of prostitution is to lie."  To find Davis guilty of count three (coercion and enticement), the jury had to find beyond a reasonable doubt that Davis coerced

[20] *United States v. McNealy*, 625 F.3d 858, 870 (5th Cir. 2010).

[21] *United States v. Pando Franco*, 503 F.3d 389, 393–94 (5th Cir. 2007).

[22] *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

[23] *United States v. Ramirez*, 954 F.2d 1035, 1037 (5th Cir. 1992).

No.  10-20794

Nichole Clock to travel in interstate commerce in order to engage in prostitution. The only evidence for this count, Davis claims, was the testimony of Nichole Clock.  That testimony was not credible for the same reasons listed against CM's testimony: it had inconsistencies, and was given by a prostitute.

Davis's argument is unavailing.  First, the mere fact that CM and Clock were, or are, engaged in prostitution does not mean that they could not serve as honest and credible witnesses.  The jury heard these two women's testimony and had an opportunity to evaluate their credibility in person during the course of the trial.  They also had the benefit of extensive cross-examination of both CM and Clock by Davis's attorney, which delved into their pasts, their motivations for testifying, and the preparation that they received from the prosecution before testifying.  After all of this, the jury apparently concluded that these witnesses were credible, and we find no reason to overcome its determination.

Davis also contends that no rational trier of fact could have believed CM and Clock's testimony because their statements were riddled with inconsistencies.  However, Davis fails to identify any actual inconsistencies in these women's stories, and a review of the trial transcript did not reveal any to this court.  Furthermore, the details given by CM and Clock about their experiences with Davis were corroborative of one another.  Finally, although testimony by CM and Clock was a key part of the government's case against Davis, the prosecution also had a substantial amount of additional evidence establishing his guilt on all three counts.  In addition to testimony by two FBI agents and a Houston area police officer who participated in the investigation, the prosecution presented at trial testimony by a Louisiana hotel clerk and physical evidence obtained from Davis's car and computer linking him to the alleged crimes.  This testimony and evidence corroborated the stories that the jury heard from CM and Clock.

13

No.  10-20794

For the foregoing reasons, we cannot conclude that CM and Clock were unreliable witnesses or that the government had insufficient evidence to convict Davis.  Therefore, we affirm his conviction.

IV

Davis's final argument on appeal challenges the sentence imposed under the guidelines by the district court.

This court "review[s] the district court's interpretation or application of the Sentencing Guidelines *de novo* and its factual findings for clear error."[24]  The district court may consider the presentence report ("PSR") as evidence in making factual determinations, and "may adopt the facts contained in [it] without further inquiry if those facts have an adequate evidentiary basis with sufficient indicia of reliability and the defendant does not present rebuttal evidence or otherwise demonstrate that the information in the PSR is unreliable."[25]  It is the defendant's burden to prove that information in the PSR is materially untrue.[26]

A.  Repeat and dangerous sex offender against minors

Davis challenges the district court's calculation of his sentencing guideline range.  He contends that the district court erred when it applied a five-level enhancement to his offense level on the basis that he had engaged in a pattern of activity involving prohibited sexual conduct with minors under U.S.S.G. § 4B1.5(b)(1).

The district court's decision to apply the five-level enhancement was based on the PSR.  The PSR alleged that Davis had engaged in sexual conduct with RD, a sixteen-year-old girl, on at least two occasions, and had acted as RD's pimp.  All of these allegations were based on the investigative files and reports

---

[24] *United States v. Trujillo*, 502 F.3d 353, 356 (5th Cir. 2007).

[25] *United States v. Cabrera*, 288 F.3d 163, 173–74 (5th Cir. 2002).

[26] *United States v. Valencia*, 44 F.3d 269, 274 (5th Cir. 1995).

of the Houston Police Department. In 2005, Davis was arrested and questioned, and released on bond. State charges related to the incident were eventually dismissed for unspecified reasons. Given the similarity of this conduct and Davis's conduct with CM, the PSR concluded that Davis had engaged in a pattern of activity involving prohibited sexual conduct with minors, and therefore that he was subject to a five-level enhancement under the guidelines.

Davis argues that the district court could not use these allegations as the basis of the enhancement because they were not credible. We disagree. The PSR stated that all of its claims regarding Davis's conduct with RD were based on the investigative reports of the Houston Police Department. These allegations therefore had a sufficient evidentiary basis and indicia of reliability, which permitted to the district court to rely on them in determining Davis's sentence.[27]

In order to overcome this presumption of reliability, Davis must provide evidence that these allegations are materially untrue. He has failed to do so. Before the district court, Davis objected that "there is insufficient evidence to show that the defendant engaged in a pattern of activity involving prohibited sexual conduct." On appeal, he repeats his claim of insufficient evidence, and alleges that the state dismissed the charges against Davis due to lack of evidence against him. However, Davis does not provide anything, other than these unsupported assertions, to demonstrate that the PSR's allegations are baseless or that lack of evidence was the reason why the charges against him regarding his alleged conduct with RD were dismissed. Because Davis has not shown that the district court erred in relying on the PSR when applying the five-level enhancement under U.S.S.G. § 4B1.5(b)(1), his claim for relief is denied.

B.    Enhancement under U.S.S.G. 2G1.3(d)(1)

---

[27] *See Cabrera*, 288 F.3d at 173–74.

No.  10-20794

Davis's second sentencing argument challenges the district court's decision to apply a two-level multiple count adjustment under U.S.S.G. § 3D1.4, based on Davis's alleged conduct with RD.

U.S.S.G. § 2G1.3(d)(1) provides:

> If the offense involved more than one minor, [the multiple count adjustment of Chapter Three] shall be applied as if the persuasion, enticement, coercion, travel, or transportation to engage in a commercial sex act or prohibited sexual conduct of each victim had been contained in a separate count of conviction.

"Offense" is defined by Application Note 1(H) of U.S.S.G. § 1B1.1 as the "offense of conviction and all relevant conduct under 1B1.3. (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context." Because Davis's alleged conduct with RD was not part of the offense for which Davis was convicted, it could only be used for a multiple count adjustment if it was part of the relevant conduct of that offense.  Relevant conduct is defined under U.S.S.G. 1B1.3(a)(1)(A) as "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant....during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

Davis correctly points out that his alleged misconduct with RD did not occur during his offense of conviction, as it was alleged to have happened on and before February 22, 2005, while his charged conduct with CM occurred from on or about June 1, 2006 to September 22, 2006.  The government does not argue, either on appeal or before the district court, that a different definition for "relevant conduct" is provided under the guidelines or is clear from context.[28]

---

[28] Indeed, the government failed to provide any response to Davis's argument on this point.

No.  10-20794

Therefore, we conclude that the district court erred in using the alleged conduct between Davis and RD as the basis for a multiple count adjustment under Chapter Three.  Without that adjustment, there would not have been an adjusted offense level for "pseudo count R.D." or "pseudo count CM" under the multiple-count adjustment provisions of U.S.S.G. § 3D1.4, and Davis's total offense level would have been 35 instead of 37.  This lower offense level, combined with Davis's Criminal History Category of V, would have resulted in a guidelines sentencing range of 262 to 327 months imprisonment instead of a range of 324 to 405 months.  Accordingly, we vacate this portion of Davis's sentence, and remand to the district court for resentencing in accordance with this opinion.

V

For the foregoing reasons, Davis's conviction is AFFIRMED.  His sentence on counts 1 and 2 is VACATED in part, and REMANDED for resentencing in accordance with this opinion.