RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0142p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

No. 16-2503

*v.*

WILLIAM ALAN SCHOCK,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:16-cr-00025-1—Robert Holmes Bell, District Judge.

Decided and Filed: July 10, 2017

Before: COLE, Chief Judge; GIBBONS and ROGERS, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:** Joshua A. Blanchard, MIEL & CARR, PLC, Greenville, Michigan, for Appellant.
Alexis M. Sanford, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for
Appellee.

_____

## OPINION

_____

JULIA SMITH GIBBONS, Circuit Judge.    William Schock was sentenced to
240 months' imprisonment after pleading guilty to the sexual exploitation of a minor.  In this
appeal, Schock challenges the application of a § 2G2.1(d)(1) sentencing enhancement for
multiple victims and claims that the district court imposed a fine that violates both the statutory

maximum penalty and the Eighth Amendment. Because the district court erred by applying § 2G2.1(d)(1), we vacate Schock's sentence and remand for resentencing.

I.

In February 2016, a federal grand jury in the Western District of Michigan returned a five-count indictment against William Schock, charging him with four counts of sexually exploiting a child in October 2011 (Count 1), June 2013 (Count 2), September 2013 (Count 3), and August 2014 (Count 4), all in violation of 18 U.S.C. § 2251. The indictment alleged that each incident involved Schock taking sexually explicit pictures of a six- to eight-year-old victim, but it did not identify the victim associated with each incident or specify the total number of victims. Schock was also charged with possessing child pornography, in violation of 18 U.S.C. § 2252A (Count 5), because he had sexually explicit pictures and videos of minor children other than the victims in Counts 1 through 4.

In May 2016, Schock entered into a plea agreement with the United States. He agreed to plead guilty to Count 3 (the September 2013 child-exploitation charge), to forfeit certain property, to pay restitution, and to register as a sex offender. Count 3 stated, in relevant part, that:

> On or about September 5, 2013, . . . [Schock] knowingly did, and attempted to, use, persuade, induce, and entice a minor to engage in sexually explicit conduct for the purpose of producing any visual depiction of such conduct . . . .
>
> Specifically, [Schock] photographed [Victim 2], depicting and intending to depict the child displaying her pubic area to the camera in a lascivious manner.

DE 4, Indictment, Page ID 13. Schock stipulated that the government could prove he had taken at least four sexually explicit photographs of an eight-year-old child (Victim 2)[1] in September 2013 and could thus establish the elements of Count 3. Although the plea agreement did not contemplate a specific calculation under the United States Sentencing Guidelines, it indicated that the court could consider all of Schock's uncharged conduct in determining the applicable

---

[1]The Presentence Investigation Report assigned the monikers Victim 1 and Victim 2 to the two children that Schock photographed. We have adopted those designations. Victim 1 is the child identified in Count 4. Victim 2 is the child in Counts 1–3.

Guidelines range. Schock preserved the ability to challenge his sentence if it was improperly calculated.

In June 2016, the district court accepted both the plea agreement and Schock's guilty plea as to Count 3. It also requested a Presentence Investigation Report (PSR). That document provides the most detailed account of Schock's conduct.[2]

The Michigan State Police started investigating Schock when Victim 1, a relative of his, revealed that Schock had taken inappropriate pictures of her. When officers executed a search warrant at Schock's Michigan home in September 2015, Schock gave a voluntary statement—admitting to photographing Victim 1 as alleged—and directed the police to four DVDs containing sexually explicit photographs. The material on these DVDs indicated that Schock had also taken inappropriate pictures of another relative, Victim 2. Investigators ultimately recovered photographs of Victim 1 that were taken in August 2014 and photographs of Victim 2 that were taken in October 2011, June 2013, September 2013, and April 2015.[3]

Starting from a base offense level of 32, the PSR recommended the following enhancements: four points under § 2G2.1(b)(1)(A) because the victim was under the age of twelve; two points under § 2G2.1(b)(5) because the defendant was a relative of the victim; five points pursuant to § 4B1.5 because the offense of conviction was a covered sex crime; and, because Shock's relevant conduct included more than one victim, two points pursuant to § 2G2.1(d)(1)'s adoption of the multiple-count enhancement in § 3D1.4. The PSR also recommended a three-point reduction for acceptance of responsibility. Schock's total offense level of 42, along with a criminal-history category of I, resulted in a Guidelines range of 360 months' to life imprisonment.

Schock objected to several of the PSR's recommendations. As relevant here, he challenged the applicability of § 2G2.1(d)(1), arguing that his exploitation of Victim 1—conduct not charged in Count 3—was not relevant conduct under the Guidelines and could not trigger the

---

[2]Although Schock objected to the relevance of some of his conduct, he never challenged the accuracy of the PSR. Accordingly, we adopt the PSR's description of the offense.

[3]With the exception of the April 2015 photographs, which were not charged, these photographs correspond with Counts 1 through 4 of the indictment.

multiple-victim enhancement. The district court overruled the objection, finding that Schock's conduct with Victim 1 was relevant. The district court adopted the PSR's Guidelines calculations but imposed a below-Guidelines sentence of 240 months' imprisonment and five years' supervised release, citing Schock's age (sixty-six), acceptance of responsibility, and low risk of re-offense.

The district court then made the following statement:

> [T]he Court is going to require that Mr. Schock pay a monthly stipend to the Federal Bureau of Prisons equal to the cost of his incarceration as determined by the Federal Bureau of Prisons and that this be paid by someone in his family when that amount is determined so that in fact the taxpayers of the United States do not have to pay the costs of his care.

DE 51, Sentencing Tr., Page ID 388–89.[4] Schock's objection to these costs as inappropriate and excessive given his financial circumstances was overruled. The criminal minutes, however, do not indicate that any fine was imposed and make no reference to the costs of incarceration. Similarly, the district court's statement of reasons indicates that a fine was waived due to Schock's inability to pay. And the written judgment framed the imposition of incarceration costs as a "recommendation" to the Bureau of Prisons (BOP).

Schock filed a timely notice of appeal challenging his sentence.

## II.

## A.

We review the reasonableness of a sentence for an abuse of discretion. *United States v. Brown*, 579 F.3d 672, 677 (6th Cir. 2009). To be procedurally reasonable, the sentencing range must have been correctly calculated under the Guidelines. *Id.* (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)). The district court's interpretation of the Guidelines and mixed questions of law and fact are reviewed *de novo* while factual findings are reviewed for clear error. *United States v. Tolbert*, 668 F.3d 798, 800 (6th Cir. 2012) (citations omitted). We are,

---

[4]Although the PSR noted a maximum statutory fine of $250,000 and estimated that the costs of incarceration would be approximately $2,552 per month, the district court did not specify the amount to be imposed.

however, deferential to the district court's application of the Guidelines to the facts of a given case. *United States v. Simmerman*, 850 F.3d 829, 832 (6th Cir. 2017); *Brown*, 579 F.3d at 677.

B.

In cases involving the exploitation of multiple minors, the Guidelines instruct the district court to determine the defendant's offense level by applying Chapter Three, Part D (Multiple Counts) "as if the exploitation of each minor had been contained in a separate count of conviction." U.S.S.G. § 2G2.1(d)(1). This provision applies "if the *relevant conduct* of an offense of conviction includes more than one minor being exploited" and regardless of whether the additional minors are cited in the count of conviction. *Id.* cmt. n.7 (emphasis added).

The Guidelines provide two definitions of "relevant conduct." First, it is defined as "all acts and omissions committed . . . or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." § 1B1.3(a)(1). Second, for those offenses "of a character for which § 3D1.2(d) would require grouping of multiple counts," relevant conduct also extends to "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction[.]" § 1B1.3(a)(2).

Schock concedes that if § 1B1.3(a)(2) applies, it is broad enough to capture his exploitation of Victim 1. But, as he rightly notes, § 1B1.3(a)(2)'s definition of relevant conduct does not apply in this case. Section 2G2.1 offenses involving the sexual exploitation of minors are explicitly excluded from § 3D1.2(d)'s multiple-count grouping rule, meaning that Schock's offense is not one "for which § 3D1.2(d) would require grouping of multiple counts." § 1B1.3(a)(2); *see also* § 2G2.1 cmt. n.7; *United States v. Weiner*, 518 F. App'x 358, 364 (6th Cir. 2013).

Thus, we must look to the narrower definition of relevant conduct in § 1B1.3(a)(1) and ask whether Schock's exploitation of Victim 1 occurred during the commission of, preparation for, or course of attempting to avoid detection or responsibility for Count 3, his offense of conviction. There is no evidence that the exploitation of Victim 1 was "in preparation for" or "in the course of attempting to avoid detection or responsibility for" his exploitation of Victim 2.

Instead, the government argues that the exploitation of Victim 1 "occurred during the commission of" the crime charged in Count 3 because it was "close in time and similar in nature to the offense in the count of conviction." We disagree. On this record, the government has not met its burden to show that Schock's exploitation of Victim 1 was conduct relevant to Count 3, his offense of conviction.[5]

This case falls in the middle of our previous § 1B1.3(a)(1) relevant-conduct cases. In *Brown*, we upheld a multiple-count enhancement because a preponderance of evidence supported the finding that the defendant had taken explicit photos and videos of two minor victims. 579 F.3d at 685. There, the defendant had admitted photographing "one or both" victims and we noted that the victims appeared together in "approximately half" of the photographs and videos and that the photos were "taken in sequence" and "within minutes of one another in the same location." *Id.*

In *United States v. Martin*, the defendant produced explicit images of three minor victims at his modeling studio. 291 F. App'x 765, 766–67 (6th Cir. 2008). At least two of the victims had attended the studio together but there was no indication that the third victim was present at the same time. *Id.* The defendant pled guilty to a single count of production involving only the third victim. *Id.* at 767. At sentencing, the district court applied § 2G2.1(d)(1) to create pseudo-counts for the exploitation of the first two victims, finding that the defendant's conduct with respect to them was relevant to the offense of conviction under the Guidelines. *Id.* at 769. We adopted that conclusion, holding that the district court "properly created pseudo-counts . . . relating to [the first two victims] to reflect the true seriousness of [the defendant's] actions." *Id.* (footnotes omitted).

In *Weiner*, we found an analogous multiple-count enhancement to be improper for a defendant who pled guilty to using the internet to entice a minor in violation of 18 U.S.C. § 2242(b). 518 F. App'x at 360. Three victims indicated that the defendant had previously engaged in prohibited sexual conduct with them. *Id.* at 360–61. We construed these allegations

---

[5]The Second Circuit has explicitly rejected the government's argument that similar conduct and temporal proximity are sufficient. *See United States v. Wernick*, 691 F.3d 108, 114–17 (2d Cir. 2012). But we need not reach that question at this point. Even if it were sufficient, the government has not established temporal overlap of Victim 1's exploitation and the offense of conviction.

as "pre-charge sexual conduct" and refused to find that it was "relevant conduct" under § 1B1.3(a)(1). *Id.* at 364. We reasoned that:

> First, none of the pre-charge sexual conduct with [the victims] occurred during the commission of the conviction offense. The pre-charge sexual conduct was not contemporaneous with the use of the computer as asserted in the Information. Second, none of the pre-charge sexual conduct with [the victims] occurred in preparation for the offense of conviction. The pre-charge sexual conduct did not involve the use of a computer or any other facility in interstate commerce to entice a minor to engage in prohibited sexual conduct and was wholly independent of the offense of conviction. Finally, none of the pre-charge sexual conduct with [the victims] occurred in an attempt to avoid detection. The pre-charge sexual conduct occurred prior to the conviction offense.

*Id.* at 365 (citing *United States v. Davis*, 453 F. App'x 452, 462 (5th Cir. 2011)). Accordingly, we held that the court erred by creating "pseudo counts" for the three victims. *Id.*

If there was evidence that Schock photographed Victim 1 and Victim 2 together in September 2013, if Count 3 captured a broader time period, or if the factual basis for Schock's plea had extended beyond September 2013, there would be no question that the disputed enhancement applies because Schock's conduct with respect to Victim 1 would have occurred during the offense of conviction. *See Brown*, 579 F.3d at 685. That, however, is not the case. Count 3 unambiguously cabins the offense conduct to Schock's photography of Victim 2 "[o]n or about September 5, 2013." DE 4, Indictment, Page ID 13. And Schock stipulated only to taking photographs of Victim 2 in September 2013. Furthermore, although the PSR indicates that the DVDs found in Schock's home contained "numerous images" of Victim 1 and Victim 2 "posing naked in the defendant's home in [Michigan] between October 29, 2011 and April 17, 2015," it identifies only the following images:

| # | Date | Image Number | Photograph Of |
|---|---|---|---|
| 1 | October 29, 2011 | DSC04082.jpg | Victim 2 |
| 2 | June 21, 2013 | DSC01634.jpg | Victim 2 |
| 3 | September 9, 2013 | DSCF1879.jpg | Victim 2 |
| 4 | August 25, 2014 | DSCF0155.jpg | Victim 1 |
| 5 | April 17, 2015 | DSC03095.jpg | Victim 2 |

DE 51, PSR, Page ID 209–10. There is no allegation that Victim 1 was photographed in September 2013, and no evidence that Victims 1 and 2 were ever photographed together. Because Schock's exploitation of Victim 1 in August 2014 did not occur until almost a year after the commission of the offense of conviction—photographing Victim 2 in September 2013—the government has not established that Schock's conduct with respect to Victim 1 occurred during the commission of the offense of conviction under § 1B1.3(a)(1).[6] Thus, even in light of the deference we give to the district court's application of the Guidelines to the facts of a case, *see Brown*, 579 F.3d at 677, the district court erred by finding, on this record, that Schock's exploitation of Victim 1 constituted relevant conduct under § 1B1.3(a)(1). Therefore, the district court necessarily erred in applying the § 2G2.1 enhancement, in creating a pseudo-count for the exploitation of Victim 1, and in calculating Schock's sentencing range under the Guidelines.

C.

Alternatively, the government argues that any sentencing error is harmless. It argues that it can show, with certainty, that the error did not cause Schock to receive a more-severe sentence because (1) Schock's 240-month sentence was "well below" the Guidelines range of 292 to 360 months that would apply without the § 2G2.1 enhancement and (2) the district court based the sentence on factors independent of the Guidelines. We disagree.

The "reliance on an incorrect range in most instances will suffice to show an effect on [a] defendant's substantial right," but there are times when such error is harmless because the record reflects that the district court "thought the sentence it chose was appropriate irrespective of the Guidelines range." *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1346–47 (2016). In such cases, the district court's explanation must establish that the sentence was "based . . . on factors independent of the Guidelines." *Id.* at 1347. Although the district court discussed independent reasons for imposing a sentence well-below the Guidelines range, it started by referring to Schock's offense level and criminal-history category and opining that the Guidelines "are really not guidelines" because they "have a mandatory sense about them that has calcified over time."

---

[6]To conclude otherwise would interpret § 1B1.3(a)(1)'s "during the commission of the offense" standard in a way that swallows the broader definition in § 1B1.3(a)(2), which defines relevant conduct as anything "part of the same course of conduct or common scheme or plan" for those offenses that are grouped together under § 3D1.2(d). The Guidelines draw a distinction between (a)(1) and (a)(2) relevant conduct. It is one we must respect.

DE 66, Sentencing Tr., Page ID 384–89. Thus, there is a strong indication here that the district court relied on an erroneous Guidelines calculation in sentencing Schock, precluding the government from showing harmless error. Accordingly, we must vacate Schock's sentence and remand his case for resentencing.

## III.

Schock also asserts that, by holding him responsible for the costs of his incarceration, the district court imposed a statutorily and constitutionally impermissible fine. Schock calculates the fine as totaling $612,420—240 months at $2,552 per month—and claims that such a fine exceeds the $250,000 statutory maximum penalty and violates the Eighth Amendment.[7]

In deciding whether to impose a fine and what amount to impose, a district court can take into account "the expected costs to the government" for a defendant's term of imprisonment and supervised release. § 5E1.2(d)(7). We have recognized that "[t]he assessment of any costs . . . of confinement are now an inherent part of a fine" and that such costs are thus included in determining whether a defendant's sentence exceeds the statutory maximum penalty. *United States v. Zakharia*, 418 F. App'x 414, 419 (6th Cir. 2011) (citation omitted). Thus, if the district court imposed $612,420 in incarceration costs, there is no question that it is a fine that exceeds the statutory maximum.

When determining the terms of a defendant's sentence, we look first to the district court's oral sentence as pronounced at sentencing. *United States v. Penson*, 526 F.3d 331, 334 (6th Cir. 2008). When an oral sentence conflicts with a subsequent written sentence, the oral sentence controls. *Id.* (citing *United States v. Schultz*, 855 F.2d 1217, 1225 (6th Cir. 1988)). "The reason for the primacy of the oral sentence lies in the fact that '[a] defendant is present only when being sentenced from the bench.'" *Id.* (quoting *United States v. Villano*, 816 F.2d 1448, 1452 (10th Cir. 1987) (*en banc*)). When the oral sentence is ambiguous, however, we look to the district court's written judgment, commitment order, and statement of reasons. *Id.*; *United States v.*

---

[7]The Guidelines provide that costs of confinement "may be guided by reports published by the [BOP] and the Administrative Office of the United States Courts concerning average costs." § 5E1.2 cmt. n.7. A June 2015 report from the Administrative Office set the monthly cost in a BOP facility at $2,552.

*Denny*, 653 F.3d 415, 421–23 (6th Cir. 2011); *United States v. Batista*, 415 F. App'x 601, 605–07 (6th Cir. 2011).

At Schock's sentencing hearing, the district court made the following statement:

[T]he Court is going to require that Mr. Schock pay a monthly stipend to the Federal Bureau of Prisons equal to the cost of his incarceration as determined by the Federal Bureau of Prisons and that this be paid by someone in his family when that amount is determined so that in fact the taxpayers of the United States do not have to pay the costs of his care.

DE 66, Sentencing Tr., Page ID 388–89. The district court then asked if there was "[a]ny legal objection to the sentence imposed . . . ?" *Id.* at 390. In response, Schock's counsel stated: "Just to the monthly cost of incarceration . . . . I don't think given my client's financial circumstances it's appropriate to impose it. It would be an excessive fine." *Id.* After confirming that Schock received pension distributions, the district court overruled the objection.

From this exchange, it is clear that Schock's counsel understood the "monthly stipend" for the costs of incarceration to be a fine imposed as part of Schock's sentence. And the district court, by framing the obligation as a requirement, used language that supports such a conclusion. Because there is no ambiguity whether a fine was imposed, the oral sentence, which imposes the costs of incarceration on Schock, controls over the written judgment, which frames the costs of incarceration as merely a recommendation.[8] *See Penson*, 526 F.3d at 334.

Although it appears to be common practice to announce the dollar amount for a defendant's costs of incarceration at sentencing, *cf. United States v. Breeding*, 109 F.3d 308, 309 (6th Cir. 1997); *Zakharia*, 418 F. App'x at 418; *United States v. Tiser*, 170 F. App'x 396, 398 (6th Cir. 2006), we are not aware of any authority that requires a district court to do so.[9] And although we have previously suggested that it is appropriate to look to the written judgment to determine the dollar amount of the fine imposed, *see United States v. Ukomadu*, 236 F.3d 333, 339 & n.2 (6th Cir. 2001) (looking past the oral sentence, in which the district court imposed

---

[8]Looking beyond whether a fine was imposed, we are concerned with the district court's statement that the costs of incarceration were to be imposed on someone in Schock's family and not Schock himself. We are unaware of a district court's authority to impose such an obligation on anyone other than the defendant.

[9]Given the primacy of the oral sentence, however, a statement on the record as to the costs to be imposed, or how those costs will be calculated, will always provide clarity for the purposes of appellate review.

only "payment of the costs of incarceration," to the written judgment where the court clarified that the defendant was obligated to a total payment of $150,032.24), the written judgment here only muddies the water by suggesting that no fine was imposed.

Ultimately, on this issue, we find ourselves in need of clarity. Specifically, the extent of the incarceration costs that the district court intended to impose. Because we are vacating Schock's sentence on other grounds, *see* Part II, *supra*, the district court will have the opportunity to provide this clarity at resentencing. Therefore, we need not decide whether the fine violates the statutory maximum, whether it violates the Eighth Amendment, or whether Schock's claim is ripe for consideration in light of the BOP's determination not to collect costs of incarceration.

## IV.

For the foregoing reasons, we vacate the sentence imposed by the district court and remand the case for resentencing.