NOT RECOMMENDED FOR PUBLICATION
File Name: 17a0642n.06

Nos. 16-2243/2395

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| | ) | Nov 20, 2017 |
| Plaintiff-Appellee/Cross-Appellant, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| KENTON MAURICE TAYLOR, | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF MICHIGAN |
| Defendant-Appellant/Cross-Appellee. | ) | |
| | ) | |
| | ) | |

BEFORE:     COLE, Chief Judge; ROGERS and GRIFFIN, Circuit Judges.

ROGERS, Circuit Judge.  Kenton Maurice Taylor and three codefendants were charged in a sixteen-count superseding indictment that alleged various crimes stemming from a heroin-distribution conspiracy.  On this appeal, Taylor argues that the government withheld evidence that one of its witnesses, Ronald Hemphill, was a "prime suspect" in a cold-case murder in Lansing.  That fact, according to Taylor, could have been used to impeach Hemphill's testimony against him because Hemphill might have thought that his cooperation would oblige state authorities not to charge him for the murder.  This and other arguments by Taylor on appeal do not warrant reversal.  The government cross-appeals, arguing that the district court should have determined Taylor's base-offense level based on the weight of the heroin after it had been "cut" or diluted with sleeping aids by the conspiracy in order to increase the total volume for distribution, rather than the raw weight of the pure heroin itself.   The district court's

determination to count only the weight of the undiluted heroin was, however, within the court's discretion to disagree with a policy judgment of the Sentencing Commission with respect to drug-quantity calculations.

I.

Taylor and his codefendants, Karl Alphonso Lockridge, Maurice Ray, Jr., and Eric Darnell Cooper, are members of the Black P Stone Nation ("BPSN"), a Chicago-based street gang that also operates a chapter in Lansing, Michigan. The BPSN regularly trafficked drugs, including heroin, and engaged in associated firearms-related offenses. The Lansing chapter of the BPSN, which Taylor led, regularly sent members to Chicago, where they would obtain heroin from Chicago-based connections. The coconspirators would bring the drugs back to Lansing where, after "cutting" or "stepping on" them, i.e., adding ground-up sleeping aids in order to increase the total volume, they would sell the finished product. Taylor claimed to have a "gift" for the cutting process.

On June 23, 2015, a grand jury returned a two-count indictment against Taylor that charged him with distributing and possessing with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(C), and with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

Taylor moved to suppress the evidence obtained during a June 16 traffic stop, his subsequent arrest and interrogation, and the search of his home. During the traffic stop, officers found a handgun and ammunition along with small amounts of heroin and marijuana in the purse of his passenger, Sequilla Arnold. The subsequent search of his home revealed several more guns, small amounts of marijuana and cocaine, a digital scale, marijuana growing equipment, and fifteen marijuana plants. Taylor sought suppression of that physical evidence. While in

state custody pursuant to the abovementioned arrest, Taylor confessed to a lot of illegal activity, so he sought to suppress those statements as well. The district court granted the motion as to the physical evidence but requested additional briefing on Taylor's statements. After that ruling, the government withdrew its opposition to the motion and agreed to not use any statements made by Taylor while in state custody.

Meanwhile, a grand jury returned a sixteen-count superseding indictment that named Taylor as the lead defendant along with Lockridge, Ray, and Cooper as codefendants. Count one charged Taylor and his codefendants with conspiring to distribute heroin from October 2012 to July 2015. Count four charged Taylor with distributing and possessing with intent to distribute heroin in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(C), and counts fifteen and sixteen charged him with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). The superseding indictment also sought criminal forfeiture of the conspiracy's profits and the firearms and ammunition seized from Taylor during the investigation. Taylor's codefendants all pled guilty to the conspiracy count. Taylor exercised his right to a jury trial.

On the day of the final pretrial conference, Taylor's counsel emailed the government to inquire about an unsolved murder from 2002. Taylor had told his counsel that one of the government's anticipated witnesses, Ronald Hemphill, was a suspect in that murder. The email from Taylor's counsel read:

> We believe that Ronald Hemphill has been a person of interest in the 2002 Lansing murder of Derrick Adams and Melinda ("Mercedes") Hobbs during a robbery, and/or that there has been talk "on the streets" that Mr. Hemphill was responsible. It is my understanding that the case is still unsolved. Mr. Adams was a friend of Mr. Taylor. I am seeking police reports on the Adams/Hobbs murder because I believe there will be material in them that I need for crossexamination of Mr. Hemphill. Are you willing and able to obtain police reports on the Adams/Hobbs murder from LPD for me? Please advise. If not, please advise if you will oppose my request for a subpoena to obtain them.

The government responded that it did not have any such evidence and that, in any event, it would probably be inadmissible:

> Our office does not have these police reports that you reference. I can tell you also that neither Mark [co-counsel] nor I have personal knowledge of this 2002 incident that you speak of. More importantly, I fail to see how you can crossexamine Mr. Hemphill based on "talk on the streets" when he has not been charged with this incident, much less convicted of it? If this is the path you intend to pursue, perhaps it is something we should address with the Court at the FPTC today.

The district court did not rule on the admissibility of this evidence before trial.

Because the physical evidence underlying the firearms charges had been suppressed, the government tried Taylor only on counts one and four (conspiracy and distribution/possession respectively). Taylor's four-day trial began on November 16. Taylor's codefendants— Lockridge, Ray, and Cooper—testified against him, along with other incarcerated coconspirators, law enforcement witnesses, and Hemphill.

The jury returned a guilty verdict. Testimony at trial established that Taylor had directed the BPSN's heroin-distribution conspiracy since his release from state prison in 2012. At his direction, the coconspirators would make regular trips to Chicago to "reup," or replenish, their inventory. According to his coconspirators, they would get anywhere from 42 to 126 grams of pure heroin on each trip to Chicago. Once back in Lansing, the coconspirators would, at Taylor's house, "cut" or "step on" the heroin by mixing it with ground-up sleeping aids. By adding anywhere from two to four grams of sleep aid to every gram of heroin, that process would multiply the finished product to be sold. Lockridge testified that the BPSN distributed between 200 to 400 grams of heroin per month.

Confidential-informant Hemphill testified at trial that he had attempted to make a controlled purchase of heroin from Taylor, who gave him a one-gram sample. On cross,

Taylor's counsel attempted to question Hemphill about the abovementioned 2002 cold-case murder of Derick Adams and Melinda "Mercedes" Hobbs. Taylor had told his counsel before trial that, according to local rumors, Hemphill was a suspect in that murder, and therefore might have a motive to "lie or shade the truth about what happened" during his encounters with Taylor. Taylor's counsel attempted to cross-examine Hemphill about his involvement with the murder. The district court forbade that line of questioning as irrelevant:

> Q [MS. HOWARD, TAYLOR'S COUNSEL]. What about Mr. Adams's girlfriend, Mercedes? I believe her real name is Melinda Hobbs.
>
> A [HEMPHILL]. Mercedes, I know who Mercedes is.
>
> Q. You don't know?
>
> A. I say I know who Mercedes is.
>
> Q. Who is Mercedes?
>
> A. Mercedes is, she was a dancer and she got killed.
>
> Q. When you say dancer, do you mean a stripper?
>
> A. If that's what you call them. I call them dancers.
>
> Q. Okay. And Ms. Hobbs was murdered or she died?
>
> MR. COURTADE [AUSA]: Your Honor, may we have a sidebar? I would like to know what the relevance of this is and the time frame we are talking about.
>
> (At sidebar)
>
> THE COURT: Where are we going with this, Ms. Howard?
>
> MS. HOWARD: My client has told me that there was an issue between him and Mr. Hemphill because my client believed Mr. Hemphill had something to do with the murder of Mr. Adams and Ms. Hobbs. And that my client is a friend of Mr. Adams. I asked the government for any police reports they had to corroborate that, but I'm at least entitled to ask him if he knows who she is and if he was involved in it.
>
> MR. COURTADE: This was the 2002 murder where you said he was a person of interest in a cold case that we don't have any records of.
>
> MS HOWARD: Did you look for records? Because you told me you wouldn't, you didn't have any –
>
> MR. COURTADE: There is no relevance to it.
>
> MS. HOWARD: Well, you – so you looked or you didn't look?

MR. COURTADE: No. I asked the witness what he knew and he said he was, helped the police in that case. That's –

MS. HOWARD: He said he helped the police?

MR. COURTADE: That's what he said.

MS. HOWARD: So there would be some records, wouldn't there then?

MR. COURTADE: I have no idea. The question is the relevance of whether you said he might be a person of interest based on street rumor. Now you're saying it's your client that had some knowledge of a murder that took place in 2002. And you want to ask the witness what his connection was to a 2002 murder?

MS. HOWARD: I do want to ask him what his connection is. If it has any potential bias against my client, I think that's entirely appropriate.

THE COURT: I don't think so. I think it's irrelevant. And there's going to be no further questioning on that issue.

MS. HOWARD: I understand. Thank you, Your Honor.

(Sidebar concluded)

On March 30, 2016, Taylor moved for a new trial based on newly discovered evidence. After trial, Taylor's counsel obtained the case file on the Adams-Hobbs murder from the Lansing Police Department by means of a FOIA request. That file, the entirety of which is not part of the record, is purportedly "replete with references to Mr. Hemphill as a suspect in the case," and included information that Hemphill had taken and failed a polygraph test. In his motion, Taylor argued that the police file was *Giglio* material that the government should have produced. He argued that, because the government had portrayed Hemphill as especially trustworthy (due to his being the only non-law-enforcement witness with no current involvement in the federal criminal system), the evidence would have impeached Hemphill's testimony by showing that he did have a motive to testify against Taylor. Taylor also argued that the jury should have known about Hemphill's failed polygraph test because the test showed that the LPD had previously judged Hemphill as untruthful. Also after trial, Taylor learned that two federal agents had told his passenger Arnold, while questioning her after the traffic stop, that the government had been

surveilling Taylor on previous trips to Chicago. According to Taylor, this was also *Giglio* material because he should have been permitted to cross-examine law enforcement officials to determine whether such evidence was improperly withheld.

The government opposed the motion, arguing that the issues raised by Taylor were not newly discovered, would be inadmissible, and were unlikely to change the result of his trial. The Adams-Hobbs file apparently revealed that there were many suspects in the murder, including Taylor himself, whose fingerprint was found at the murder scene. The file also revealed that it was Taylor who had offered Hemphill to the Lansing police as a potential suspect. The government also argued that Arnold's statements were untrue and not newly discovered.

After a short hearing, the district court denied Taylor's motion from the bench. The court ruled that Hemphill's status as one of many suspects in the Adams-Hobbs murder was not newly discovered evidence. The court further ruled that Hemphill's polygraph results were inadmissible and immaterial. Finally, the court ruled that the information in Arnold's affidavit was not newly discovered and was not material because the court had already suppressed all evidence from the traffic stop.

After its presentence investigation, the probation office calculated Taylor's guidelines range as life in prison. Holding Taylor responsible for an amount of heroin equal to 3,493 kilograms of marijuana equivalent, the report recommended a base-offense level of 32, and it also recommended several enhancements, including one for use and possession of a firearm during the criminal activity, for a final offense level of 43 (the guidelines maximum). Taylor objected to the drug-quantity calculation and all of the sentence enhancements, including the one for possessing a firearm.

At a two-day sentencing hearing, the court found Taylor responsible for 630 grams of heroin, arriving at that figure by considering only the "raw" rather than the "cut" weight of the heroin. The district court explained:

> I'm accounting for raw heroin. I mean you can drive up the amount of heroin or any other drug that can be cut like cocaine exponentially, and, you know, maybe there's authority out there that says I'm wrong about that. And I'll be happy to read about it in a Sixth Circuit opinion at some point down the line. But I think that's inherently unfair. You have—I realize that the indictment says what it says about substance with some measurable amount of heroin, but I think that is just a grossly unfair way to calculate the amount of drugs being distributed, and to drive up the amount being attributed to any one individual by so much just seems to me to be unconscionable.

The government objected. As a result of that calculation, the court set the base-offense level at 26.

The district court also applied the two-level possession-of-firearm enhancement. Taylor argued that there was insufficient evidence showing that guns were possessed during the conspiracy because the testimony of his coconspirators was inconsistent and not credible. In response, the government argued that multiple witnesses had testified that Taylor directed that his coconspirators have guns. The district court found that the conspiracy had used guns on its trips to Chicago. The court explained:

> With regard to the possession of a gun, the argument that the government makes here is that the only purpose for this group was to distribute drugs. And there certainly is a lot of evidence that guns and drugs go together for purposes of protecting the individuals, protecting the drugs, protecting the proceeds. But I don't think that there is—the only, the only real strong evidence in my view of the connection between the drugs and the guns is the testimony of the trips to Chicago. I think the other testimony about the presence of guns is pretty thin. And, again, is more related to a given lifestyle than it is to an actual conspiracy to distribute drugs. But I do think that the testimony with regard to taking guns back and forth to Chicago to get drugs, that does convince me that there was, it was part of the conspiracy. And so with regard to the guns, the objection is denied.

Determining the offense level to be 31, after having applied enhancements for possessing a firearm and managing the conspiracy, the court imposed the minimum guidelines' recommendation of 151 months.

Taylor now appeals both the district court's denial of his motion for a new trial and his sentence. He argues that the district court should have given him a new trial because the government, in violation of *Brady* and *Giglio*, withheld the Adams-Hobbs murder file, which would have impeached Hemphill, and the purported additional surveillance of Taylor, which would have allowed cross-examination of federal agents and undermined confidence in the jury verdict. Taylor also argues that the district court incorrectly credited his coconspirators' testimony when it imposed the two-level possession-of-firearm sentencing enhancement. The government cross-appeals, arguing that the district court erred when it calculated Taylor's sentence and forfeiture amount based on the raw weight of the heroin, rather than the "cut" weight—which would have included the weight of the sleeping aids—that was actually distributed by the conspiracy.

II.

The district court correctly denied Taylor's motion for a new trial because the evidence he relied on was not new. The district court also did not clearly err when it applied the two-level possession-of-firearm sentencing enhancement because there is sufficient testimonial evidence in the record showing that Taylor or his coconspirators carried guns during trips to Chicago. Finally, the district court appropriately exercised its discretion to reject the sentencing guidelines when it based Taylor's sentence and the forfeiture judgment against him on only the raw weight of the heroin procured by the conspiracy.

A.

The district court did not abuse its discretion when it denied Taylor's motion for a new trial. The court correctly found that Taylor's proffered evidence was not newly discovered and therefore did not warrant a new trial.

The Adams-Hobbs murder file cannot be the basis for a new trial because it was cumulative of things that Taylor already knew. To succeed on a Rule-33 motion for a new trial based upon newly discovered evidence, a defendant must first point to evidence that was discovered after trial, or else inquiry ends. *See United States v. Turns*, 198 F.3d 584, 586–88 (6th Cir. 2000). Facts within the defendant's knowledge at the time of trial are not newly discovered for the purposes of Rule-33 motions. *See United States v. Garcia*, 19 F.3d 1123, 1126 (6th Cir. 1994). The record makes it abundantly clear that Taylor knew Hemphill to be a suspect in the murder prior to trial, which is all the Adams-Hobbs file appears to say.[1] The only part of the file that Taylor attached to his motion was the Lansing Police Department's report of a 2009 interview of a federal prisoner, who said that "'Ron' [presumably Hemphill, whose first name is Ronald] might have killed the guy on Riverview." Based entirely on circumstantial evidence, including the interviewee's having overheard the end of "Ron's" conversation before buying drugs from him, the interviewee said that he "fe[lt] that either this Ron guy killed [Adams] or had him killed for the drug debt." Questions of reliability aside, that evidence does not show anything that Taylor did not already know at the time of his trial; it merely implicates Hemphill as a suspect in the murder. The court forbade Taylor's counsel from pursuing that same line of inquiry on cross, and that ruling is not before us. There is no reason to grant Taylor a new trial so that the district court can exclude this evidence all over again.

---

[1] Indeed, according to the government's characterization of the Adams-Hobbs file, Taylor himself is the one who originally implicated Hemphill in that murder.

The rest of the Adams-Hobbs file, which Taylor did not attach to his motion and is not otherwise a part of the record, appears to be more of the same. It is purportedly "replete with references" to Hemphill and names him as a "prime suspect" in the murder. Even if that characterization of the file were true (a point the government disputes), it would still not be newly discovered information sufficient for a new trial. Hemphill's being a "prime" suspect is not meaningfully different from his being a mere suspect, a point on which the district court forbade Taylor's counsel from questioning Hemphill. There is no reason to expect a different evidentiary ruling in a new trial.

Taylor argues that the jury should have heard that Hemphill was a suspect in the murder because that fact purportedly incentivized him to testify against Taylor to avoid being prosecuted for the murder, but the claimed contents of the file simply do not provide any newly discovered evidence of such a bias. The file (at best) reveals additional details about the investigation showing that Hemphill is a "prime" suspect in the murder. To argue that Hemphill therefore had a motive to testify falsely against Taylor to avoid being charged with murder is, without more, mere attenuated speculation unsupported by any new evidence. At bottom, Taylor asks us to assume that Hemphill's bias exists purely because of his status as a suspect. But that fact alone was already known by Taylor and ruled irrelevant by the district court, so it cannot serve as the basis for a new trial.

The Adams-Hobbs file also supposedly contains a report that Hemphill failed a polygraph examination.[2] The results of polygraph examinations are categorically inadmissible for impeachment because they are inherently unreliable, *see United States v. Scarborough*, 43 F.3d

---

[2] Like all of the Adams-Hobbs file save for the interview discussed above, the results of Hemphill's polygraph exam are not part of the record.

1021, 1026 (6th Cir. 1994), so the absence of that evidence could not possibly have affected Taylor's trial, and therefore does not require a new one.

Taylor's other theory is even less promising. He argues that the government failed to disclose that its agents were surveilling him prior to his June 16 arrest. Taylor bases those allegations solely on an obtained-after-trial affidavit sworn by Arnold, his passenger at the time of that arrest. In her affidavit, Arnold stated that, while questioning her after Taylor had been arrested, a federal agent said that "the traffic stop [which led the arrest] of Mr. Taylor's vehicle was 'not a coincidence' and that federal agents had been surveilling Mr. Taylor since April 2013." Taylor argues that, based on that information, he should be given the opportunity to "cross-examine federal agents" about it and to "investigate whether surveillance evidence was withheld." The statements in Arnold's affidavit are not sufficient for a new trial. Even assuming that there was evidence of surveillance that the government did not disclose, such evidence would have made no difference to Taylor's case. First of all, the district court suppressed all physical evidence from the traffic stop, and by stipulation the government did not use Taylor's confession made after his subsequent arrest, so no evidence resulting from the traffic stop contributed to Taylor's conviction. Moreover, the statements in Arnold's affidavit would have had no impeachment value: Taylor seeks to use the information in the affidavit to "cross-examine federal agents," but the only federal agent who testified against him was DEA agent Steve Bailey, who did not testify about the traffic stop or any surveillance prior to that stop. The statements in Arnold's affidavit do not require a new trial.

In sum, none of the information pointed to by Taylor is sufficient for a new trial under Rule 33. Although the Adams-Hobbs file might have revealed additional details about the investigation and the fact that Hemphill was a "prime" suspect, no newly discovered evidence

pointed to by Taylor supports his argument that Hemphill had a motive to testify against Taylor. The failed polygraph examination is irrelevant because it could not have been used to impeach Hemphill, and the information in Arnold's affidavit would have made no difference to Taylor's trial. Thus, the district court did not abuse its discretion when it denied Taylor's motion for a new trial.

B.

Although the testimony regarding firearm possession was somewhat inconsistent, the record supports a finding that "a firearm was possessed," thereby warranting a two-level sentence enhancement under USSG §2D1.1(b)(1).

The district court found that firearms were a part of the conspiracy led by Taylor, and that finding was not clearly erroneous. The record contains ample testimonial evidence that there were weapons present during the course of this conspiracy.[3] For example, at trial Lockridge testified that Taylor had given him a gun to take on his first trip to Chicago, for the specific purpose of protecting the drugs that the coconspirators intended to purchase. Lockridge also testified that, on his second trip to Chicago, the group, which also included Taylor, was again armed. Lockridge further testified that, although Taylor did not attend the third trip to Chicago, Taylor directed the group to carry a firearm. In light of that evidence, the district court correctly applied the possession-of-firearm sentence enhancement. Under the sentencing guidelines, "[i]f a dangerous weapon (including a firearm) was possessed," then a defendant's base-offense level must be "increase[d] by 2 levels." USSG §2D1.1(b)(1). According to the guidelines' application notes, "[t]he enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." USSG §2D1.1(b)(1)

---

[3] We need not consider the parties' argument about whether the district could have considered the suppressed firearm for sentencing purposes. The district court did not rely on suppressed evidence to impose the enhancement, and the testimonial evidence alone is sufficient to sustain the enhancement.

comment. (n.11). Taylor's sentence was properly enhanced if a dangerous weapon was possessed during the "relevant conduct," which includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity," *see United States v. Clisby*, 636 F. App'x 243, 247 (6th Cir. 2016) (quoting USSG §1B1.3(a)). Because there is ample evidence showing that there were guns present during the conspiracy, and because Taylor has not argued that the weapons were unconnected to the conspiracy, *see United State v. Miggins*, 302 F.3d 384, 390–91 (6th Cir. 2002) (shifting burden to defendant after the government shows that weapons were present), applying the enhancement was appropriate.

The fact that the testimony of Taylor's coconspirators was at times inconsistent does not mean that the district court clearly erred by crediting that testimony. It is true that Lockridge, who testified on direct that Taylor had given him a gun to protect the conspiracy's drugs on their first trip to Chicago, later contradicted himself on cross by saying that he had not taken a gun to Chicago with Taylor and that his prior testimony was incorrect. However, on redirect, Lockridge reaffirmed that he and his coconspirators did take guns on their trips to Chicago. Taylor also points to several contradictory statements given by Lockridge in an interview with ATF Agent Steve Bailey, but Lockridge explained on redirect that he was "minimizing [his complicity] because I didn't want to put myself in more trouble." Taylor also points to Ray's proffer interview, in which Ray stated that Lockridge, rather than Taylor, had given him the gun that he took to Chicago. These inconsistencies, though present, do not warrant reversal. When reviewing for clear error, we only reverse only "when . . . upon review of the entire record, [we are] left with the definite and firm conviction that a mistake has been committed." *United States v. Hurst*, 228 F.3d 751, 756 (6th Cir. 2000). As the Supreme Court has instructed:

> If the district court's account of the evidence is plausible in light of the record
> viewed in its entirety, the court of appeals may not reverse it even though

convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985). Deference is even more appropriate where, as here, the district court's finding necessarily rests on determinations of witness credibility in the face of inconsistent testimony.

## C.

With regard to the government's cross-appeal, the district court did not err by basing its drug-quantity calculation on the raw weight of the heroin procured by the conspiracy instead of the guidelines' recommendation of its "cut" weight. The district court appropriately exercised its discretion recognized by the Supreme Court in *Kimbrough v. United States*, 552 U.S. 85 (2007), and *Spears v. United States*, 555 U.S. 261 (2009), to reject a sentencing-guidelines provision based on a policy disagreement with it.

Here, the district court determined Taylor's base-offense level by considering the raw weight of the pure heroin that the conspiracy procured from Chicago. The district court explained that to do otherwise, i.e., to calculate the drug quantity based on the diluted weight distributed by the conspiracy, would be "grossly unfair" and "unconscionable" because "you can drive up the amount of heroin or any other drug that can be cut like cocaine exponentially," which would inflate the "amount being attributed to any one individual." The sentencing guidelines, however, provide that "the weight of a controlled substance set forth in the table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance." USSG §2D1.1(c) n.A. The government therefore argues that the district court erred by substituting its own drug-quantity calculation method for that prescribed by the sentencing guidelines.

The district court's decision falls squarely under the authority recognized by *Kimbrough* and *Spears*, which establish that district court judges may categorically reject the sentencing guidelines based solely on policy disagreement with them. In *Kimbrough*, the defendant pled guilty to both crack and powder cocaine offenses and associated conspiracy and firearm charges. 552 U.S. at 91. After determining the guidelines range to be 228 to 270 months, the district court determined that such a sentence would be greater than necessary to accomplish the purposes of sentencing set forth in § 3553(a). *Id.* at 92–93. Taking special note of the "disproportionate and unjust effect that crack cocaine guidelines have in sentencing," the court sentenced the defendant to the below-guidelines statutory minimum of 180 months. *Id.* at 93. The Fourth Circuit vacated the defendant's sentence, holding that "a sentence outside the guidelines range is per se unreasonable when it is based on a disagreement with the sentencing disparity for crack and powder cocaine offenses." *Id.* The Supreme Court reversed, holding that the district court was within its discretion to deviate from the 100-to-1 crack-powder sentence disparity. *Id.* at 110. *Spears* took *Kimbrough*'s holding a step further: In a summary reversal, the Court emphatically affirmed *Kimbrough*'s holding, clarifying the "district courts' authority to vary from the crack cocaine Guidelines based on *policy* disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case." 555 U.S. at 264.

The circumstances of this case are similar to those in *Kimbrough*. There, the district court first "properly calculate[d] and consider[ed] the advisory Guidelines range" before concluding that the § 3553(a) factors weighed in favor of a reduced sentence. 552 U.S. at 110. And here, the district court considered the proposed guidelines sentence contained in the presentence report:

> Now, I do want to make it clear also that while the original scoring in this case resulted in an advisory range of life for Mr. Taylor, I would not have imposed a life sentence. Regardless of the rulings on the objections, I would have varied considerably and probably down to the level that we are, where we are now.

In *Kimbrough*, the district court deviated from the guidelines in large part due to policy disagreement with the guidelines disparity between crack and powder cocaine. *See* 552 U.S. at 93. Here, the district court rejected the life sentence prescribed by the "original scoring," and unambiguously explained that it was calculating the sentence based on the raw amount of heroin because to do otherwise would have been "grossly unfair" and "unconscionable." Just as *Kimbrough* and *Spears* explicitly permit courts to adopt a crack-powder sentence ratio other than the 100-to-1 ratio prescribed by the guidelines based solely on a policy disagreement with the guidelines, *see Spears*, 555 U.S. at 265–66, so too do they permit the district court here, based on a similar policy disagreement, to impose a sentence based only on the raw weight of the heroin procured by the conspiracy.

Just as *Kimbrough* and *Spears* are not limited to the crack-powder cocaine context, a point we recognized in *Herrera-Zuniga*, 571 F.3d at 585, and other circuits agree, *see id.* (collecting cases). In *Herrera-Zuniga*, we held that, under *Kimbrough* and *Spears*, it is permissible for a district court to exercise its authority to categorically reject the guidelines when it is "unpersuaded that the offense level chosen by the Sentencing Commission fulfilled the sentencing goals set forth by Congress in § 3553(a)." 571 F.3d at 586. That is exactly what the district court did in this case:

> I think that a sentence of life in this case was clearly unnecessary to meet the statutory directive of a sentence which is sufficient but not greater than necessary to achieve those goals that I just laid out: The goals of punishment, respect for the law, deterrence, and protection of the public.

Thus, under precedent of the Supreme Court and this circuit, the district court acted appropriately.

The government argues that *Chapman v. United States*, 500 U.S. 453 (1991), controls this case, but it does not. There, the Supreme Court considered whether a district court should, when sentencing a defendant, consider the total weight of the LSD and blotter paper (an absorbent paper substrate used to distribute and consume LSD) together, or the weight of the pure LSD only. *See id.* at 455. The Court held that, because "[t]he statute refers to a 'mixture or substance containing a detectable amount'" of LSD, "[s]o long as it contains a detectable amount [of LSD], the entire mixture or substance is to be weighed when calculating the sentence." *Id.* at 459. Although *Chapman* primarily dealt with the mandatory-minimum statute,[4] its holding also applies to the guidelines, which were also at issue in the case and were materially identical to the statute, *see* 500 U.S. at 461–62. But the Court decided *Chapman* before its decision in *United States v. Booker*, 543 U.S. 220 (2005), rendered the sentencing guidelines "essentially advisory." *Id.* at 245. When *Chapman* was decided, and up until *Booker*, a sentencing court had no discretion to depart from any part of the guidelines. So when, as here, a guideline was materially indistinguishable from the one interpreted in *Chapman*, the district court would have been required to calculate the base-offense level based on the total weight of any substance containing a measurable amount of an illegal drug, as *Chapman* prescribes. But post-*Booker*, the drug-calculation guideline is (like any other) merely advisory, so the district court retains discretion to depart from it. At bottom, although *Chapman* is a binding interpretation of the drug-quantity guideline, that guideline no longer binds the district court.

---

[4] The statute is not at issue here: Taylor's 151-month sentence is above the statutory minimum and below the statutory maximum under either drug-quantity calculation method. *See* 21 U.S.C. § 841(b).

For these reasons, the district court did not err when it rejected the guidelines method for calculating drug quantity.

III.

We affirm the judgment of the district court.

GRIFFIN, Circuit Judge, concurring in the judgment.

I agree we should affirm and join the majority opinion, except for its resolution of the cross-appeal. I write separately because the majority views the district court as having committed no error in calculating Taylor's Guidelines range using the heroin's raw weight instead of its cut weight. Unlike my colleagues, I view this as an error, albeit a harmless one.

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which becomes "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). If a district court "improperly calculate[s]" that range, it has committed a "significant procedural error." *Id*. at 51.

In the present case, the district court calculated Taylor's base-offense level using the raw weight of the pure heroin the conspiracy procured from Chicago. This was error. The Guidelines required the court to use "the entire weight" of the cut heroin because it was a "mixture . . . containing a detectable amount of the controlled substance." U.S.S.G. § 2D1.1, n. (A).

My colleagues characterize the district court's ruling as "fall[ing] squarely under" *Kimbrough v. United States*, 552 U.S. 85 (2007), and *Spears v. United States*, 555 U.S. 261 (2009), which they say "establish that district court judges may categorically reject the sentencing guidelines based solely on policy disagreement with them." I read *Kimbrough* and *Spears* differently. I view the cases as outlining a two-step process. In step one, the district court sets a benchmark by properly calculating the defendant's Guidelines range. In step two, the district court considers the § 3553(a) factors, and determines whether a sentence within the Guidelines range is consistent with § 3553(a)'s overarching instruction to impose a sentence sufficient but not greater than necessary to accomplish the sentencing goals advanced in

§ 3553(a)(2). *Kimbrough* and *Spears* permit a district court, in step two, to conclude that a sentence within the Guidelines range would be greater than necessary; to base that conclusion on a policy disagreement with the Guidelines; and then to vary downward and impose a lesser sentence. But Supreme Court precedent does *not* permit a district court to invoke its policy disagreement as justification to abandon the Guidelines' prescribed method of calculating the benchmark range in the first instance (step one).

Instead, *Kimbrough* reaffirmed that the Guidelines range plays "a key role" as the "starting point" of sentencing, and noted that the district court there "began by properly calculating and considering the advisory Guidelines range." 552 U.S. at 108, 110. And in *Spears*, the Court emphasized that the "point of *Kimbrough*" was "a recognition of district courts' *authority to vary* from . . . [the] Guidelines based on [a] *policy* disagreement with them." 555 U.S. at 264 (first emphasis added).

When applied here, *Kimbrough* and *Spears* required the district court to properly calculate Taylor's Guidelines range by using the weight of the cut heroin. Then, given the district court's policy disagreement with the Guidelines, it could have "reject[ed] and var[ied] categorically" from that initial benchmark. *Id.* at 266. Thus, by calculating Taylor's Guidelines range using the heroin's raw weight instead of its cut weight, the district court erred in determining the Guidelines "starting point." *Gall*, 552 U.S. at 49.

But such a Guidelines scoring error does not always require reversal; "there are times when [an] error is harmless because the record reflects that the district court 'thought the sentence it chose was appropriate irrespective of the Guidelines range.'" *United States v. Schock*, 862 F.3d 563, 569 (6th Cir. 2017) (quoting *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1346–47 (2016)). "In such cases, the district court's explanation must establish that the

sentence was based on factors independent of the Guidelines." *Id.* (internal quotations and ellipses omitted). And here, the district court noted that a sentence within a Guidelines range calculated using the heroin's cut weight would have been greater than necessary, and that had it used the cut weight it would have varied downward to the sentence and forfeiture judgment it imposed. Under these circumstances, the district court's error was harmless.

In all other respects, I join the majority opinion.